IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


KIMBERLY ANNETTE KLINE-PARRIS,

            Plaintiff,

vs.                                                    CASE NO. 1:10-cv-111-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

            Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a period of disability and disability insurance benefits.  (Doc. 1.)  The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions.  (Docs. 16 and 22.)  For the reasons discussed below, the Commissioner's decision is due to be reversed and remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act") on July 7, 2006 alleging a disability onset date of June 10, 2005.  (R. 114, 116, 174-76.)  Plaintiff's application was denied initially and upon reconsideration.  (R. 114.)  Plaintiff then filed a timely request for an administrative hearing on March 12, 2007.  (R. 114.)  Plaintiff appeared and testified at

an administrative hearing that was held by video-conference on September 12, 2008.

(R. 120.)  On November 20, 2008 the Administrative Law Judge ("ALJ") issued a written

decision concluding that Plaintiff was not disabled and thus was not entitled to a period

of disability insurance benefits.  (R. 114-20.)  Plaintiff timely filed a request for review of

the ALJ's decision by the Appeals Council on November 24, 2008 and the Appeals

Council denied Plaintiff's request for review on July 1, 2010.  (R. 1-2, 108-09.)  Plaintiff

then filed her Complaint in this case on June 16, 2010.  (Doc. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial

evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more

than merely create a suspicion of the existence of a fact, and must include such

relevant evidence as a reasonable person would accept as adequate to support the

conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the

district court will affirm, even if the reviewer would have reached a contrary result as

finder of fact, and even if the reviewer finds that the evidence preponderates against

the Commissioner's decision.[3] The district court must view the evidence as a whole,

---

[1] *See* 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); *accord,* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

taking into account evidence favorable as well as unfavorable to the decision.[4]
However, the district court will reverse the Commissioner's decision on plenary review if
the decision applies incorrect law, or if the decision fails to provide the district court with
sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by
reason of any medically determinable physical or mental impairment that can be
expected to result in death, or has lasted or can be expected to last for a continuous
period of not less than twelve months.[6]  The impairment must be severe, making
Plaintiff unable to do her previous work, or any other substantial gainful activity which
exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8]  First, if a
claimant is working at a substantial gainful activity, he is not disabled.[9]  Second, if a
claimant does not have any impairment or combination of impairments which
significantly limit his physical or mental ability to do basic work activities, then he does

---

[4] Foote, 67 F.3d at 1560; *accord,* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

not have a severe impairment and is not disabled.[10]   Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11]   Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12]   Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]   The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]   The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

---

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F. 3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform.  In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17]  In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III.  SUMMARY OF THE RECORD

#### A.    Personal Background

Plaintiff was born in November 1963.  (R. 29.)  Plaintiff graduated from high school.  (R. 190.)  Her past work experience was primarily as a collections manager.  (*Id.*)

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). *See* Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] *See id.*

**B.**   **Evidence Considered By the ALJ**

The evidence considered by the ALJ consisted primarily of Plaintiff's medical records from 2001 and thereafter as well as the reports prepared by several examining and non-examining physicians.

Plaintiff was treated by Dr. Larry Chidgey, a hand specialist, from July 2001 through October 2001 for bilateral upper extremity pain.  (R. 446-50.)  Her right hand and wrist were tender upon examination and a splint was constructed for her right wrist.  (R. 446-49.)  An MRI of Plaintiff's lumbar spine in July 2001 showed early disc degeneration at L5-S1.  (R. 312.)  In October 2001, Plaintiff was treated at the Florida Arthritis & Allergy Institute for pain in her ankles, feet, shoulders, hands and lower back.  (R. 303.)  The progress note from that visit reflects a conclusion of possible early rheumatoid arthritis as well as "questionable" fibromyalgia.  (*Id.*)  An MRI of Plaintiff's cervical spine on December 4, 2001 reflected normal findings.  (R. 360.)

In April 2002, Plaintiff was treated by Dr. Roland Staud at the Shands Rheumatology Clinic. (R. 457-59, 494-96.)  She was diagnosed with chronic pain syndrome and sleep disturbance consistent with fibromyalgia.  (R. 458, 495.)  Plaintiff received treatment from Dr. James Atchison at the Shands SpineCare Center in May 2002.  (R. 305-07.)  On examination, Plaintiff was fidgety and suffered from midline and bilateral paraspinal tenderness in the cervical, thoracic, lumbar and sacral spine.  (R. 306.)  She was diagnosed with myalgia and myositis.  (*Id.*)

On May 30, 2002, Dr. Manuel Diaz, M.D. completed an attending physician's long-term disability statement for Plaintiff.  (R. 27-29.)  He noted Plaintiff suffered from

chronic pain syndrome and fibromyalgia.  (R. 27.)  She could stand for less than 30 to

60 minutes, walk less than two blocks, and lift/carry less than ten pounds.  (R. 29.)  She

was unable to reach/work overhead or push or pull.  (*Id.*)  Dr. Diaz opined Plaintiff was

unable to work due to her impairment as of May 30, 2002 for an indefinite time. (*Id.*)  On

September 6, 2002 Plaintiff returned to see Dr. Atchison.  (R. 497-99.)  Dr. Atchison

noted Plaintiff had tenderness in the cervical and thoracic spine and reduced range of

motion in both her cervical and thoracic spine due to diffuse pain.  (R. 498.)

On February 3, 2003, Dr. Lori Waxenberg, Ph.D., a consultative psychologist,

completed a psychiatric attending physician's statement of disability for Plaintiff.  (R.

308-09.)   Dr. Waxenberg assigned Plaintiff a Global Assessment of Functioning

("GAF") score of 40. (R. 308.)  Plaintiff's mental status examination revealed her mood

was anxious/depressed and her judgment and concentration were moderately impaired.

(R. 309.)  Dr. Waxenberg noted Plaintiff suffered from poor coping skills, somatic focus,

attention and concentration difficulties, and had difficulty adapting to the demands of

the work environment.  (*Id.*)  She opined Plaintiff would require the ability to alternate

between sitting and standing, have frequent breaks, be in a low stress environment and

concluded Plaintiff was unable to return to work due to significant emotional distress.

(*Id.*)

Plaintiff returned to Dr. Staud, the rheumatologist, on February 27, 2003.

Examination reflected she had "diffuse myofascial tender points including the 18

recognized fibromyalgia tender points."  (R. 461-62.)  An MRI of Plaintiff's lumbar spine

in March 2003 reflected minor degenerative disk disease at L5-S1, with a broad based

disk bulge and a small annular tear.  (R. 465.)  On March 24, 2003 she was seen by Dr.

Atchison, who noted the MRI findings but also stated "we could not account for the

amount of pain that Ms. Kline-Parris is in" and "[w]e believe that with the amount of pain

Ms. Kline-Parris is in, it is more related to her myalgia and myositis versus the minimal

findings noted on her MRI."  (R. 463-64.)

On a July 25, 2003 visit to Dr. Atchison, Plaintiff reported having fallen on July

18, 2003 and the doctor noted Plaintiff appeared uncomfortable and in pain.  (R. 503.)

She showed tenderness in the cervical, thoracic, lumbar and sacral spine and Plaintiff's

range of motion in each of those areas was reduced.  (*Id.*)  On July 29, 2003, Dr.

Atchison completed an attending physician's long-term disability statement for Plaintiff.

(R. 561-62.)  He diagnosed Plaintiff with chronic pain syndrome and fibromyalgia and

stated she had permanent limitations per her hand surgeon, Dr. Chidgey, who had

placed her in the light duty range.  (*Id.*)

Examination on April 26, 2004 by Dr. Staud revealed tenderness in Plaintiff's

midline suprapubic area, tightness in her cervical spine and tenderness in twelve out of

the eighteen recognized fibromyalgia trigger points.  (R. 466-67.)  During a visit to Dr.

Atchison on September 22, 2004, Plaintiff reported worsening neck, upper and lower

back pains and increased numbness in her extremities, left more than right.  (R. 378,

472.)  Plaintiff experienced pain everywhere with very light palpation.  (R. 379, 473.)

The progress notes reflected her doctors "cannot account for the amount of pain she is

having nor all the various places where she is having the pain from her findings."  (R.

380, 474.)

X-rays of Plaintiff's left shoulder performed on June 13, 2005 reflected normal

8

findings, while anteroposterior X-rays of her pelvis did not reveal any significant abnormalities.  (R. 349.)  On June 23, 2005, Plaintiff underwent an MRI of the left shoulder. (R. 31, 347-48, 399.) The MRI showed "tendinosis/tendinitis of the supraspinatus and to a lesser degree of the infraspinatus tendons with some mild, bursal sided partial thickness tearing of the supraspinatus tendon but no full thickness tears identified."  (*Id.*) There were also "changes that can be seen in the setting of shoulder impingement syndrome with subacromial/subdeltoid bursitis" but no labral tears.  (*Id.*)   On September 16, 2005 Plaintiff reported to her internal medicine specialist, Dr. Umna Ashfaq, persistent shoulder pain and continued low back, hip and leg pain. She was diagnosed with a rotator cuff tear. (R. 381-82.)

On October 6, 2005, Dr. Michael Moser, an orthopedist, examined Plaintiff. (R. 352-53, 383-84, 474-76.)  Plaintiff had a positive speed's test and empty can test and was "essentially ... tender to palpation everywhere throughout her anterior, superior and posterior aspects of her shoulder as well as along her trapezius."  (*Id.*)  Dr. Moser noted it was "very difficult to get a pinpoint examination on her because she hurts with almost every maneuver and is tender everywhere" and he concluded Plaintiff "is basically suffering from exacerbation of her fibromyalgia."  (R. 353, 384, 476.)

From May 22, 2006 through July 18, 2006, Plaintiff underwent a vocational evaluation at Santa Fe Community College's Work Exploration Center. (R. 361-71.) Plaintiff was advised to reapply for Social Security benefits, as competitive employment did not appear feasible or realistic due to Plaintiff's pain level and the unpredictability of her symptoms.  (R. 367-68.)

On September 28, 2006, Plaintiff was examined by consulting physician Dr. Robert Greenberg, M.D. (R. 410-14.)  Examination revealed decreased range of motion and pain of the cervical and lumbar spine and both hips.  (R. 413.)  Dr. Greenberg did note Plaintiff "was not putting forth full effort with regard to strength testing and ROM testing." (*Id.*)  Plaintiff also had decreased right arm grip strength, decreased strength in both legs of 4/5, positive straight leg raising pain bilaterally at 45 degrees and difficulty stooping. (R. 413-14.)  She was diagnosed with probable osteoarthritis of the cervical and lumbar spine, hips, and shoulders.  (R. 414.)  MRI scans of Plaintiff's lumbar spine performed on September 28, 2006 in conjunction with Dr. Greenberg's examination reflected mild scoliosis.  (R. 410.)

Plaintiff underwent a consultative psychological examination on October 4, 2006 by Dr. Jeffrey Gedney, Psy.D.  (R. 415-18.)  Examination revealed Plaintiff's mood was dysphoric and her affect was generally agitated and hyperaroused.  (R. 417.)  Plaintiff frequently cried during her examination, expressing frustration with her predicament. (*Id.*)  Dr. Gedney noted "[w]hile there was no evidence of attentional or memory deficits during the evaluation, it is likely that she experiences these deficits within her day-to-day routine, as is typical with individuals experiencing chronic pain and stress." (*Id.*). She was diagnosed with pain disorder associated with both psychological factors and a medical condition, a chronic adjustment disorder with mixed anxiety and depressed mood, fibromyalgia, and irritable bowels.  (R. 417-18.)  Dr. Gedney assigned her a GAF of 60.  (R. 418.)  He concluded Plaintiff's prognosis for return to work was poor due to the chronic nature of her condition and Plaintiff's family-related stressors.  (*Id.*)

10

Dr. Angeles Alvarez-Mullin, M.D. completed a Mental Residual Functional Capacity assessment and a Psychiatric Review Technique of Plaintiff, both of which were dated October 17, 2006.  (R. 427-44.)  With respect to Plaintiff's mental RFC, Dr. Alvarez-Mullin concluded Plaintiff was moderately limited in (i) the ability to understand and remember detailed instructions, (ii) the ability to carry out detailed instructions, (iii) the ability to maintain attention and concentration for extended periods, (iv) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, (v) the ability to interact appropriately with the general public, and (vi) the ability to set realistic goals or make plans independently of others.  (R. 427-28.)  With respect to Plaintiff's functional capacity, Dr. Alvarez-Mullin concluded Plaintiff was capable of (i) carrying out simple tasks in a low demand work situation, (ii) carrying out a work routine independently, (iii) learning new skills, (iv) adjusting to changes in the work routine, (v) capable of making decisions in her own behalf, and (vi) relating adequately to others, although she may have difficulty working with the public.  (R. 429.)  On the Psychiatric Review Technique, Dr. Alvarez-Mullin noted Plaintiff had a chronic adjustment disorder with mixed anxiety and a depressed mood and a pain disorder associated with both psychological factors and a general medical condition. (R. 434, 436, 437, 443.)

Plaintiff was again examined by Dr. Moser in November 30, 2006 for left shoulder pain. Upon examination she was tender to palpation over her entire left shoulder. (R. 483, 517.)  Dr. Moser diagnosed left shoulder rotator cuff strain and impingement.  (*Id.*)

11

Dr. Val Bee, Psy.D. completed a Mental Residual Functional Capacity assessment and a Psychiatric Review Technique of Plaintiff, both dated February 13, 2007.  (R. 518-35.)  With respect to Plaintiff's mental RFC, Dr. Bee concluded Plaintiff was moderately limited in (i) the ability to understand and remember detailed instructions, (ii) the ability to carry out detailed instructions, (iii) the ability to maintain attention and concentration for extended periods, (iv) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and (v) the ability to set realistic goals or make plans independently of others. (R. 532-33.)  With respect to Plaintiff's functional capacity, Dr. Bee concluded Plaintiff was mentally capable of well structured task activity and at least superficially appropriate social interaction, but cognitive sequela from Plaintiff's pain and depression may disrupt detailed learning and cause occasional lapses in concentration and efficiency.  (R. 534.)  On the Psychiatric Review Technique, she noted Plaintiff had an adjustment disorder with emotional features and a depressed mood and a pain disorder.  (R. 521, 524.)

Dr. Donald Morford, M.D. completed a Physical Residual Functional Capacity Assessment dated February 21, 2007.  (R. 536-43.)  Dr. Morford concluded Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and push and/or pull unlimited amounts.  (R. 537.)  With respect to these physical capacities, he noted a "20/10 listing with occasional to frequent left upper extremity overhead use and avoidance of extremes seems feasible with

12

continued treatment." (*Id.*)  With respect to Plaintiff's manipulative limitations, he noted Plaintiff was limited to occasional to frequent overhead use of the left upper extremity and her right upper extremity was without any limitations whatsoever.  (R. 539.)

Dr. Aymen Kenawy, M.D., a rheumatologist, examined Plaintiff on July 30, 2007. (R. 566-68.)  On examination Plaintiff exhibited tenderness to palpation in her upper and lower extremities, decreased range of motion in all extremities secondary to pain, and motor strength of 4/5 in all extremities.  (R. 567.)  On a visit to Dr. Ashfaq on August 3, 2007 Plaintiff appeared to be uncomfortable and moving around constantly. (R. 569.)  The progress note reflected that Plaintiff's left thumb and index finger were tender to physical examination, but no abnormalities were noted.  (R. 569.)

On December 14, 2007, Plaintiff was again treated by her hand surgeon, Dr. Chidgey, for continuing "problems on her left thumb and index finger for triggering; as well as her right lateral epicondylitis." (R. 572.)  Plaintiff was given an injection in her right trigger thumb and was instructed to return as needed for further trigger finger injections.  (*Id.*)  Dr. Chidgey also completed a Physical Capacity Evaluation of Plaintiff that same day. (R. 641.)  He opined Plaintiff could only lift and carry five pounds occasionally to one pound frequently.  (*Id.*)  He opined Plaintiff could never perform fine manipulation and she could only rarely perform gross manipulation or reaching.  (*Id.*) He checked boxes corresponding to both "Never" and "Rarely" when asked how often Plaintiff could perform pushing/pulling movements with arm and/or leg controls.  (*Id.*) As the medical basis for his opinion, he wrote "trigger thumb and finger." (*Id.*)

Plaintiff's chiropractor, Anthony Howe, also prepared an opinion regarding

her functioning on December 17, 2007.  (R. 573-76.)  Dr. Howe opined Plaintiff was only able to lift and carry ten pounds occasionally and five pounds frequently. (R. 576.) She could only sit, stand or walk for four hours during an eight hour day.  (*Id.*)  She could rarely climb, bend, stoop, or reach but could frequently perform gross and fine manipulation.  (*Id.*)  Dr. Howe's diagnosis was lumbar spondylosis, lumbar radiculitis, left shoulder impingement syndrome and fibromyalgia. (*Id.*)

On January 3, 2008, Plaintiff self-reported a flare-up of her fibromyalgia and pain in both shoulders and left hip to Dr. Moser.  (R. 579.)  On examination Plaintiff experienced diffuse pain with palpation around her shoulder girdle and trapezius and left greater trochanter.  (*Id.*)   Plaintiff was again examined on February 11, 2008 by Dr. Staud, her rheumatologist.  (R. 600-02.)  His examination reflected multiple tender points, mainly in Plaintiff's trapezius area and lower back, and two trigger points in her trapezius area.  (R. 601.)  She was given trigger point injections in the two trigger points in her trapezius area.  (R. 602.)  On October 14, 2009 Plaintiff returned to Dr. Chidgey complaining of pain around the thumb CMC joint on her right hand.  (R. 700.) Examination reflected that Plaintiff had some degenerative changes, mild subluxation, a positive grind test and some crepitance.  (*Id.*)  Plaintiff was given a thumb splint.  (*Id.*)

### C.   <u>Hearing Testimony</u>

Plaintiff testified at her administrative hearing.  She testified she has constant pain in her neck, back, shoulders and feet, stating that her "whole body hurts at different times, different levels."  (R. 124.)  Plaintiff testified the pain in her back and neck gives her the most trouble of all of her medical problems.  (R. 125-26.)

Plaintiff testified she has serious problems with her hands.  She is unable to engage in the repetitive use of her hands because she has a bone spur in one hand. (R. 133.)  She also has trigger thumb and trigger finger in her left hand.  (*Id.*)  Her hand problems limit her ability to grab, lift and hold objects.  (*Id.*)  Plaintiff stated she also cannot walk for very long because she has plantar fasciitis, numbness and tingling in her feet.  (R. 127.)  Plaintiff testified she could lift five pounds or less.  (R. 129.)  She can only stand for 10-15 minutes, can only walk for 15 minutes and can only sit for 15 minutes.  (R. 129-30.)

As for her activities of daily living, Plaintiff lays in bed and watches television, performs physical therapy exercises, applies ice and heat to her joints, and occasionally prepares light meals.  (R. 127.)  She lays down for 2-3 hours every day, but occasionally has to lay down for the entire day if she has a migraine headache.  (R. 130.)  She also has memory and concentration problems, which her doctors have determined are stress-induced.  (R. 131.)

Plaintiff testified she has not worked since June 2005.  (R. 129.)  Plaintiff's last job was with a health insurer.  (R. 128.)  Her duties included copying files and mailing contracts to doctors' offices.  (*Id.*)  She was on light duty for the entire year before she ceased working.  (*Id.*)  During the year that she was on light duty, Plaintiff made numerous mistakes, such as mailing the wrong contracts or making too few or too many copies, and consequently was asked to leave the job and apply for disability benefits. (R. 128, 131.)  Prior to that, she worked in collections.   (R. 128.)  In that position, she was responsible for answering phones, typing and calling customers.  (*Id.*)

D.   **Findings of the ALJ**

In his decision the ALJ concluded Plaintiff had the severe impairments of fibromyalgia, degenerative disc disease, hypertension and depression.  (R. 116.)  He determined Plaintiff did not have an impairment or combination of impairments that met or equaled the Listings.  (*Id*.)  The ALJ further concluded Plaintiff had the RFC to perform "light work as defined in 20 C.F.R. 404.1567(b) except she was limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling" and "she retained the mental residual functional capacity to understand, remember, and carry out semi-skilled tasks."  (R. 116-17.)  The ALJ concluded Plaintiff was capable of performing her past relevant work as a bill collector.  (R. 120.)  He further noted this position did not require the performance of work-related activities precluded by Plaintiff's RFC.  (*Id.*)  Consequently, the ALJ concluded Plaintiff had not been under a disability from June 10, 2005, the alleged disability onset date, through December 31, 2007, Plaintiff's date last insured.  (*Id.*)

## IV. DISCUSSION

Plaintiff contends there were at least three errors in the ALJ's written decision. First, she argues the Commissioner erred in failing to make any findings regarding the mental requirements of her past relevant work as a bill collector even though the ALJ concluded Plaintiff exhibited moderate limitations in concentration, persistence and pace.  Second, Plaintiff argues the ALJ erred in his evaluation of the opinions of several non-examining state agency physicians.  Third, Plaintiff contends the ALJ failed to conclude Plaintiff suffered from any upper extremity limitations, despite the opinion of

Plaintiff's treating hand surgeon to the contrary.  The Court will address each issue in turn below.

**A.    The ALJ Erred in Not Making Any Findings Regarding The Mental Requirements of Plaintiff's Past Relevant Work**

Plaintiff contends the ALJ erred by failing to make any findings regarding the mental requirements of Plaintiff's past relevant work as a bill collector even though the ALJ concluded Plaintiff exhibited moderate limitations in concentration, persistence and pace.  The Court agrees.

With regard to Plaintiff's mental limitations the ALJ stated "Although she did not exhibit any attention or memory deficits during her evaluation with Dr. Gedney, I give her the benefit of the doubt and find she has moderate restriction in maintaining concentration, persistence, and pace, due to somatic concern and pain, but not to such an extent to prevent her from carrying out detailed tasks."  (R. 120.)  Without any discussion of the mental demands of her past relevant work the ALJ concluded Plaintiff was capable of performing past relevant work as a bill collector both as Plaintiff had actually performed that position as well as how that position is generally performed in the national economy.  (*Id.*)

Before considering whether the ALJ erred in failing to make findings concerning the mental demands of Plaintiff's past relevant work, the Court must consider a threshold issue raised by Plaintiff. Plaintiff argues the ALJ improperly included bill collector as past relevant work because she actually worked as a supervisor in the collections area.

Plaintiff testified she previously had worked in collections and her job duties in

that capacity included answering phones, typing and calling customers.  (R. 128.)  On

her application for disability benefits, Plaintiff stated she worked as a collections

manager for different companies from 1991 until 2002.  (R. 190.)  In describing her

duties in this position, she noted she performed office work, utilized the telephone, dealt

with customer relations, typed, performed work on a computer, did bookkeeping and

dealt with the mail.  (R. 190.)  On a work background report Plaintiff completed, she

stated her work between at least 1998 and 2002 had involved, among other things,

telephone work, collections, mailing collection letters, data entry, and taking customer

payments.  (R. 248.)

The Dictionary of Occupational Titles ("DOT") provides the following definition for

the position of a bill collector:

> Locates customers to collect installments or overdue accounts,
> damage claims, or nonpayable checks: Visits or phones customer and
> attempts to persuade customer to pay amount due or arranges for
> payment at later date. Questions neighbors and postal workers at post
> office to determine new address of customers. May have service
> discontinued or merchandise repossessed. Keeps record of collections
> and status of accounts. May deliver bills. May sell insurance or other
> service. May be designated according to type of collection as Claims
> Collector (clerical); Insurance Collector (insurance); Utility-Bill Collector
> (clerical).  GOE: 07.03.01 STRENGTH: L GED: R3 M3 L3 SVP: 4 DLU:
> 81.[21]

While Plaintiff is technically correct that her past work in the collections field does not

exactly match the definition of bill collector provided in the DOT the inclusion of bill

collector by the ALJ does not constitute fundamental error sufficient to effect the

outcome of the case.  According to her own testimony, and according to the disability

---

[21] DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, § 241.367-010 (rev. 4th ed. 1991).

18

application and work background Plaintiff filled-out, Plaintiff performed many of the duties of the bill collector job in her previous work in collections.  The duties that Plaintiff described were thus close enough to the duties of a bill collector, described in the DOT, that the ALJ's inclusion of the position of bill collector in Plaintiff's past relevant work was not error.

The ALJ erred, however, in failing to make any findings or even discuss the mental demands of Plaintiff's past relevant work as a bill collector, particularly in view of the fact that the ALJ concluded Plaintiff exhibited moderate limitations in concentration, persistence and pace.

The regulations pertaining to Step Four of the sequential analysis direct the ALJ to compare the claimant's RFC with the physical and mental demands of the claimant's past relevant work.[22]  In doing so, the ALJ must consider whether the claimant's RFC would prevent the claimant from performing the mental and physical requirements of that past relevant work.[23]  Under the Commissioner's own rulings "the ALJ has a duty to fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform her past relevant

---

[22] 20 C.F.R. § 404.1520(f).

[23] Schnorr v. Bowen, 816 F.2d 578, 581 (11th Cir. 1987)("Where there is no evidence of the physical requirements and demands of the claimant's past work and no detailed description of the required duties was solicited or proffered, the Secretary cannot properly determine whether the claimant has the residual functional capacity to perform his past relevant work."); Neims v. Bowen, 803 F.2d 1164, 1165 (11th Cir. 1986).

work."[24]

In this case, the ALJ failed to include in his written decision any discussion or make any findings whatsoever with respect to the mental requirements or physical requirements of the position of bill collector.  And as explained below, the failure to discuss the physical requirements of the job of bill collector created further error in view of the fact that there was evidence of a restriction in Plaintiff's upper extremity which could impact her ability to reach and the ability to engage in tasks involving gross and fine manipulation. (R. 128, 190, 248.)

 Because the ALJ concluded Plaintiff could perform her past relevant work both as she performed it and as the work is generally performed in the national economy, the Plaintiff would be not disabled if she could perform either. The problem is that the ALJ failed to discuss the specific demands of Plaintiff's job as she performed it and made no mention of the demands of the job as generally performed in the national economy.

Turning first to the mental demands of the job as generally performed in the national economy, the DOT's definition of bill collector has a Level Reasoning Development level of 3, meaning that to perform that position an individual must "[a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in

---

[24] Nimick v. Secretary of Health and Human Services, 887 F.2d 864, 866 (8th Cir. 1989); SSR 82-61, 1982 WL 31387; SSR 82-62, 1982 WL 31386 ("The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.").

or from standardized situations."[25]  The ALJ determined that Plaintiff possessed the RFC to "understand, remember, and carry-out semi skilled tasks."  (R. 117.)  However, the ALJ failed to mention or even discuss the mental requirements of a bill collector as generally performed in the national economy. Moreover, the ALJ's conclusion that Plaintiff could perform semi-skilled work does not address the issue of whether mental limitations would effect the ability to perform a given job. Simply because a claimant can perform semi-skilled work does not mean the claimant can [a]pply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form" and "[d]eal with problems involving several concrete variables in or from standardized situations." Nor does a determination that a claimant can perform semi-skilled work mean the claimant would not have problems maintaining concentration, persistence, and pace.

Similarly, with respect to the mental requirements of the job of bill collector as Plaintiff actually performed it, the record is devoid of any discussion or findings concerning the mental tasks involved in performing that job. The Plaintiff's testimony at the hearing did not include any mention of what were the mental aspects of her previous work in collections.  The Court is left to guess whether maintaining concentration and pace for extended periods of time were requirements of the Plaintiff's past work and, if so, how important these abilities were to actually performing Plaintiff's past job of bill collector, as she performed it.  And as discussed above, the ALJ's finding that Plaintiff could perform semi-skilled work does not address whether problems

---

[25] DEP'T OF LABOR, *supra* note 21, App. C, § III.

maintaining concentration, persistence and pace would have any impact upon the ability to perform semi-skilled work.  As such, the ALJ's conclusion that Plaintiff can "understand, remember, and carry-out semi skilled tasks" says nothing about whether Plaintiff could perform the mental requirements of the bill collector position as Plaintiff actually  performed it.

Accordingly, because the ALJ failed to discuss or analyze the mental requirements of the job of bill collector, either as Plaintiff actually performed it or as it is generally performed in the national economy, the ALJ's conclusion that Plaintiff can perform her past relevant work is flawed and requires remand to the Commissioner so that the ALJ can address the mental demands of Plaintiff's past relevant work and then determine whether she is able to perform the demands of the job taking into account her mental limitations.

**B.** **The ALJ Erred In His Treatment of The Medical Opinions of the Non-examining State Agency Physicians and the Medical Opinion Expressed By Plaintiff's Hand Specialist, Dr. Larry Chidgey**

Plaintiff also contends the ALJ erred with respect to his treatment of the opinions of three non-examining state agency physicians, Drs. Donald Morford, Angeles Alvarez-Mullin and Val Bee, and the opinion of Plaintiff's treating hand specialist, Dr. Larry Chidgey.

Regarding the non-examining physicians, Plaintiff contends the ALJ erred by: (i) ignoring the opinion of Dr. Donald Morford, a non-examining state agency physician, who restricted Plaintiff's use of her upper left extremity, (ii) failing to discuss the opinion of Dr. Alvarez-Mullin, another non-examining state agency physician, who opined

Plaintiff could only carry out simple tasks in a low demand work situation, and (iii) failing to credit the opinion of Dr. Val Bee, another non-examining state agency psychologist, who opined Plaintiff's pain and depression may disrupt her ability to learn and perform detailed tasks.  Plaintiff also alleges the ALJ erred in rejecting the opinion of Plaintiff's treating hand specialist, Dr. Larry Chidgey, who opined that Plaintiff could never perform fine manipulation and only rarely perform gross manipulation or reaching.

With regard to the opinions of treating physicians it is well-established that substantial or considerable weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless "good cause" is shown to the contrary.[26]  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[27]

With regard to other medical opinions  "the ALJ [is] required to state with particularity the weight he gave the different medical opinions and the reasons therefor."[28]  While there is no requirement for the ALJ to discuss every medical record in the administrative record, he is "required to state with particularity the weight he gave

---

[26] Crawford v. Commissioner of Social Security, 363 F. 3d 1155, 1159 (11th Cir. 2004) (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997))("We have found 'good cause' to exist where the doctor's opinion was not bolstered by the evidence, or where the evidence supported a contrary finding. We have also found good cause where the doctors' opinions were conclusory or inconsistent with their medical records.").  See also Edwards v. Sullivan, 937 F.2d 580, 583-584 (11th Cir. 1991); Sabo v. Commissioner of Social Security, 955 F. Supp. 1456, 1462 (M.D. Fla.1996); 20 C.F.R. § 404.1527(d).

[27] 20 C.F.R. § 404.1527(d)(2).

[28] Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir. 1987.)

the different medical opinions and the reasons therefor."[29]  Additionally, because an

ALJ is not permitted to substitute his judgment for that of the medical experts,[30] the ALJ

cannot reject portions of a medical opinion without providing an explanation for such a

decision.[31]  Where an ALJ fails to sufficiently explain how he reached his decision, the

Court may not speculate.[32]

In this case the ALJ failed to follow these principles with respect to his evaluation

and treatment of the opinions of Drs. Morford, Bee, Alvarez-Mullin and Chidgey. The

Court will address each medical opinion in turn

### 1.    Dr. Morford's Opinion

Despite endorsing the opinion expressed by non-examining state agency

physician, Dr. Donald Morford, with respect to Plaintiff's physical RFC, the ALJ

inexplicably ignored Dr. Morford's opinion that Plaintiff had a  left upper extremity

restriction.  Dr. Morford completed a Physical Residual Functional Capacity

Assessment dated February 21, 2007 and concluded that Plaintiff had a "20/10 listing

with occasional to frequent left upper extremity overhead use and avoidance of

extremes seems feasible with continued treatment."  (R. 537.)

In his decision the ALJ found: "I afford significant weight to a State agency

---

[29] Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990)(noting "the ALJ should state the weight he accords to each item of impairment evidence and the reasons for his decision to accept or reject that evidence").

[30] Graham v. Bowen, 786 F.2d 1113, 1115 (11th Cir. 1986); Freeman v. Schweiker, 681 F.2d 727, 731 (11th Cir. 1982).

[31] Morrison v. Barnhart, 278 F. Supp. 2d 1331, 1337 (M.D. Fla. 2003).

[32] Owens v. Heckler, 748 F.2d 1511, 1516 (11th Cir. 1984).

medical consultant's opinion [Dr. Morford] indicating that the claimant retains the exertional residual functional capacity to perform a reduced range of light work (Exhibit 23F).  The State agency medical consultant's opinion is well supported by the medical evidence and the claimant's own description of her daily activities as stated in her written reports and as reported to a consulting psychologist on October 4, 2006."  (R. 119.)  Despite the fact the ALJ wholly endorsed and gave great weight to the opinion of Dr. Morford – including finding his opinion was consistent with the medical evidence – the ALJ completely ignored Dr. Morford's opinion that Plaintiff was restricted to occasional or frequent overhead use of her upper left extremity. The ALJ never discussed this limitation and did not include a reaching limitation in Plaintiff's RFC.  This was error.

Because the ALJ gave great weight to Dr. Morford's opinion but failed to discuss or consider Dr. Morford's opinion that Plaintiff's use of the upper left extremity was restricted, the ALJ erred by failing to articulate a reason for not adopting that portion of Dr. Morford's opinion. This error was compounded by the fact that the ALJ failed to discuss the physical requirements of Plaintiff's past relevant work as a bill collector. Because the ALJ failed to address the physical demands of that job the Court cannot determine whether Plaintiff's job as a bill collector involved overhead reaching and, thus, would be impacted by Dr. Morford's restrictions regarding the left upper extremity.

Accordingly, because the ALJ's decision is silent as to his reasons for not including Dr. Morford's restrictions on Plaintiff's use of her upper left extremity, the case is due to be remanded to the Commissioner so that an ALJ can address the weight to be given to the portion of Dr. Morford's opinion that Plaintiff's manipulation with her left

upper extremity is restricted.

### 2.    Dr. Bee's Opinion

The ALJ also erred by improperly affording little weight to the opinion of non-examining state agency psychologist, Dr. Val Bee, Psy.D., who opined that Plaintiff's pain and depression would disrupt her ability to learn and perform complex tasks.

Dr. Bee completed a Mental Residual Functional Capacity assessment dated February 13, 2007.  (R. 518-35.)  She concluded Plaintiff was mentally capable of well structured task activity and at least superficially appropriate social interaction, but that cognitive sequela from Plaintiff's pain and depression may disrupt detailed learning and cause occasional lapses in concentration and efficiency.  (R. 534.)

With respect to Dr. Bee's opinion the ALJ found: "I also afford little weight to the State agency medical consultant's opinion indicating that the claimant is restricted to unskilled work (Exhibit 22F)" because "[t]he objective medical evidence and the claimant's written statements of record do not support a finding that the claimant has attention, concentration or memory deficits that prevent her from understanding, remembering, and carrying out detailed tasks compatible with semi-skilled work."  (R. 119.)  In support of this conclusion, the ALJ noted Dr. Jeffrey Gedney did not observe any attention or memory deficits during his psychological evaluation of the Plaintiff.  (*Id.*) The ALJ also cited Plaintiff's activities of daily living in support of his rejection of Dr. Bee's opinion.

The ALJ's decision to give little weight to Dr. Bee's opinion was not supported by substantial evidence and is actually at odds with the evidence cited by the ALJ in

support of his decision to give little weight to Dr. Bee's opinion.  While the ALJ appropriately recognized that Dr. Jeffrey Gedney had not observed any attention or memory deficits during his evaluation of Plaintiff, the ALJ ignored  Dr. Gedney's conclusion that Plaintiff's prognosis for returning to work was poor due in part to her "escalating cycle of medical exacerbation and maladjustment."  (R. 417-18.)  As such, Dr. Gedney's conclusion was more consistent with Dr. Bee's view than it was with the ALJ's conclusion that Plaintiff could perform semi-skilled work.

Plaintiff's activities of daily living also do not support the ALJ's decision to give little weight to Dr. Bee's opinion. Plaintiff reported she sometimes lays in bed and watches television but also testified to stress-induced concentration and memory problems she described as "fibro fog."  (R. 127, 131.)  She also noted she had been terminated from her last job because she was making all sorts of mistakes, including making the incorrect number of copies and mailing the wrong contracts to doctor's offices.  (R. 128.)

 Accordingly, while standing alone, the ALJ's treatment of Dr. Bee's opinion is not grounds for reversal and remand, the Court, nonetheless, determines that the ALJ's rejection of Dr. Bee's opinion was not supported by substantial evidence and therefore because the case is due to be remanded the ALJ on remand should give further consideration to Dr. Val Bee's opinion.

### 3. Dr. Alvarez-Mullin's Opinion

The ALJ also improperly failed to address the opinion expressed by non-examining state agency physician, Dr. Angeles Alvarez-Mullin, M.D., in which Dr. Alvarez-Mullin opined that Plaintiff was restricted to carrying out simple tasks in a low

demand work situation.

Dr. Alvarez-Mullin completed a Mental Residual Functional Capacity assessment dated October 17, 2006.  (R. 427-44.)  She concluded Plaintiff was capable of: (i) carrying out simple tasks in a low demand work situation, (ii) carrying out a work routine independently, (iii) learning new skills, (iv) adjusting to changes in the work routine, (v) making decisions in her own behalf, and (vi) relating adequately to others, although she may have difficulty working with the public.  (R. 429.)

The ALJ completely ignored Dr. Alvarez-Mullin's opinion and failed to discuss her opinion even in a summary fashion in his written decision.  The ALJ should have at least addressed Dr. Alvarez-Mullin's opinion and provided a reason for considering or not considering her opinion. The failure to do so requires remand  to the Commissioner so that the ALJ properly can consider and determine the appropriate weight to be accorded to the opinion expressed by Dr. Alvarez-Mullin.

### 4.    Dr. Larry Chidgey's Treating Physician Opinion

Lastly, the ALJ erred by improperly rejecting the opinion of Plaintiff's treating hand specialist, Dr. Larry Chidgey, who found that Plaintiff could never perform fine manipulation and only rarely can perform gross manipulation or reaching.

In a Physical Capacity Evaluation Dr. Chidgey opined that Plaintiff could never perform fine manipulation and she could only rarely perform gross manipulation or reaching.  (*Id.*)  (R. 641.)  As the medical basis for his opinion, Dr. Chidgey wrote "trigger thumb and finger."  (*Id.*)  Dr. Chidgey's opinion was based on a long history of treating Plaintiff, as he had treated Plaintiff for pain in her upper extremities since as

early as July 2001 and was still doing treating Plaintiff as late as October 2009.  (R. 446-50, 700.)

With respect to Dr. Chidgey's opinion the ALJ stated: "On December 14, 2007, treating physician, Larry Chidgey, M.D., estimated the claimant's lifting/carrying capacity at less than the sedentary exertional level and he indicated little or no ability to push, pull, reach overhead, and use her hands for manipulation.  He attributed these limitations to trigger thumb and trigger finger.  These limitations are not supported by the objective medical evidence."  (R. 118.)  That is the extent of the ALJ's discussion of his reasons for rejecting Dr. Chidgey's opinion. Because Dr. Chidgey is a treating physician the ALJ was required to articulate specific reasons supported by substantial evidence in the record for rejecting his opinion. The ALJ completely failed to do so.

Moreover, contrary to the ALJ's statement that Dr. Chidgey's opinion is not supported by the objective medical evidence, a review of the evidence of record reflects that Dr. Chidgey's opinion that Plaintiff was restricted in the upper extremity was actually consistent with the other objective medical evidence in the record.

For example, Dr. Morford concluded that Plaintiff was restricted in the use of her upper left extremity to occasional to frequent overhead use.  (R. 539.)  Moreover, diagnostic studies of record support Dr. Chidgey's opinion. A June 23, 2005 MRI of the Plaintiff's left shoulder showed tendinitis, shoulder impingement syndrome and tears in the muscles of her left shoulder.  (R. 31, 347-48, 399.)  Plaintiff was also diagnosed with a rotator cuff tear by Dr. Ashfaq in 2005 and a left shoulder rotator cuff strain and impingement by Dr. Moser in 2006. (R. 381-82, 483, 517.)

Thus, contrary to the ALJ's conclusional statement that the objective medical

evidence does not support Dr. Chidgey's opinion, the objective medical evidence of record, including findings by other doctors and the results of diagnostic testing, support Dr. Chidgey's treating physician opinion that Plaintiff had upper left extremity limitations. Accordingly, the Court concludes the ALJ erred by failing properly to articulate reasons, supported by substantial evidence in the record, for rejecting Dr. Chidgey's opinion.

## V.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **REVERSED AND REMANDED** to the Commissioner under Sentence Four of 42 U.S.C. § 405(g) for further proceedings with instructions to the ALJ to analyze the medical evidence and medical opinions as described above – and as required by applicable law, regulations and rulings –  and to properly analyze the mental and physical demands of Plaintiff's past relevant work as a bill collector and then determine whether Plaintiff can perform the mental and physical demands of that job in light of the ALJ's evaluation of Plaintiff's RFC.

**IN CHAMBERS** in Gainesville, Florida, on August 18, 2011.

*s / Gary R. Jones*

GARY R. JONES
United States Magistrate Judge


**NOTICE TO THE PARTIES**
        **Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**